**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Christine Babnik, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 18-CV-04490 |
| | ) | |
| THE VILLAGE OF ANTIOCH, | ) | Judge John J. Tharp, Jr. |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Christine Babnik suffered an injury while working for the Police Department of the Village of Antioch ("the Village"). After symptoms associated with that injury grew worse, Babnik asked the Village to assign her to a light-duty position—or a position working at a desk instead of on patrol. Despite the availability of light duty at the time, the Village summarily denied her request. Unresolved questions of fact remain as to whether, at the time, that denial was a failure to accommodate a reasonable request for an accommodation. Questions of fact also remain as to whether Babnik's sex motivated the Village's decision given that the Village assigned similarly situated male officers to light duty.

These disputes of fact pertain, however, to only a short period. Two months after Babnik's original request for light duty, it became clear that any light duty assignment Babnik was requesting was a permanent one. The Village did not have any permanent light duty positions, however, and the law does not require the Village to create new positions to accommodate disabled workers; instead, the Village terminated Babnik. She claims that her termination was discriminatory and retaliatory, but fails to adduce evidence that could support a jury verdict in her favor on the termination claim. The uncontroverted evidence demonstrates that Babnik was terminated due to the lack of a permanent light duty position, rather than discrimination or

retaliation. The Village's motion for summary judgment is therefore granted in part and denied in part.

## I.    Background

Babnik worked as a patrol police officer for the Antioch Police Department, which employed her from 2005 to 2016. In 2010, Babnik suffered an injury to her jaw and neck during a work-related incident. That injury caused her severe pain, chronic headaches, and difficulties in speaking and hearing clearly. Citing ongoing and recurring symptoms, Babnik filed a disability pension application in January 2016.

Notwithstanding her injuries in 2010, Babnik worked regular patrol duties and, so far as the record reflects, requested no accommodation in assignment based on her injuries until mid-July of 2016. On July 15, 2016, Babnik asked her supervisor, Commander Rick Moritz, for an assignment on light duty. A police officer working light duty completes assignments that do not involve working patrol on the road, such as making phone calls, preparing documents, updating case files, and low-level investigative work. Although the Department allowed police officers with temporary medical ailments to work light duty while recovering, the Department did not have permanent light-duty positions.

No formal policy prescribed requirements for obtaining light duty or the process of requesting it. Instead, patrol officers like Babnik generally understood that they had to follow the chain of command to request light duty on a case-by-case basis. The Chief of Police, Steve Huffman, headed the chain, and the Village delegated to him the ultimate authority to decide who would receive light duty. The Deputy Chief of Police was next in the chain, followed by Commanders, Sergeants, and Patrol Officers. Pursuant to this hierarchy, Babnik directed her light-duty request to Commander Moritz. Babnik had previously followed this process. In January 2015, the Department granted her light duty request after she told her supervisor, Sergeant Geoff

Guttschow, that she was pregnant. The Department granted her light duty request before she submitted a doctor's note to support it.

When requesting light duty in 2016, however, Babnik submitted a "Medical Permission Excuse" from her physician, Dr. Mark Jacob, along with her request for light duty. *See* ECF No. 68-7. Dr. Jacob's note indicated that he consulted with Babnik on July 14, 2016. According to the note, Babnik was struggling with "balance issues, pain that disturbs her vision[,] and normal function." *Id.* Jacob recommended that Babnik receive an MRI and a neurology assessment. Until those assessments were complete, the note continued, Babnik's "regular duties could be impaired." *Id.* The note concluded with asking the recipient to "consider excusing Christine from routine work until further notice." *Id.* Jacob did not define the term "routine work" in the note; nor did he explain the type of activities that Babnik could perform. In later deposition testimony, however, Babnik recalled that Jacob told her that she could perform light-duty work.

For his part, Jacob later testified that he did not review any sort of job description to form an opinion about Babnik's work capacities and that it was not his purview at the time to determine whether Babnik could have performed light-duty work. He testified that he remembered joking with Babnik during the examination that she could at least work as a crossing guard. He also testified that his records did not reflect that Babnik was totally incapacitated in July of 2016. From his notes and recollection, Jacob testified to a reasonable degree of medical certainty that Babnik could have performed desk work at the time he examined her.

According to Babnik, Moritz told her that he would respond to her request after meeting with Huffman and Village Clerk Lori Romine. Moritz passed along the note to Chief Huffman and did not tell Babnik that the doctor's note she provided contained insufficient detail to support her

request. Between July 15, 2016 and August 8, 2016, Babnik requested light duty from Moritz several more times.

Both before and after Babnik made her request for light duty in the summer of 2016, the Village allowed several male officers to work light duty. Patrol Officer Alex Moreno sustained a shoulder injury on the job in May 2015, and the Police Department assigned him to light duty two months later. Without having been instructed to do so by the Police Department, Moreno submitted several doctors' notes that indicated that he could perform only restricted duties. Sergeant Guttschow testified that on one occasion, he approved Moreno's light duty request before Moreno had provided a doctor's note. Another officer, Sergeant Norm Johnson, also experienced a shoulder injury in August 2016, after which he worked a light duty assignment between October 2016 and March 2017. Johnson testified that he understood that he was required to provide a doctor's statement to support his light-duty request, and that he submitted such documents to the Village without its prompting. Finally, Officer Jake Marsh similarly received a light-duty assignment in late 2017 after injuring his knee. Sergeant Guttschow testified that Marsh was required to submit a release to go on light duty before being assigned that role, but Babnik asserts that there is no evidence that Marsh actually submitted such a note.

On July 20, 2016, the Village sent Babnik a letter informing her of her rights under the Family and Medical Leave Act ("FMLA"). According to the letter, because Babnik had notified the Village that she was "unable to work," she was eligible for FMLA benefits. 7/15/2016 Letter, ECF No. 68-20. The Village requested documentation to support an FMLA request. Babnik did not consider her request to Moritz to be a suggestion that she was unable to work in any capacity, so she asked Moritz to clarify. Moritz directed her to meet with Village Administrator James Keim to discuss the matter.

4

Babnik and her husband, Scott Babnik (a deputy in the Lake County Sheriff's Office), met with Village Administrators Keim and Romine to discuss FMLA leave on August 2, 2016. Keim and Romine told Babnik that she needed to go on FMLA leave to keep her job. Babnik disagreed; she did not believe that FMLA leave was appropriate. When Babnik raised the subject of light-duty work, Keim and Romine told her that they were not involved in decisions involving light duty; that was left up to the Police Department.

On that understanding, Babnik sent a text message to Moritz six days later to ask whether light duty was available to her. Moritz showed the text message to Huffman, who told Moritz to call Babnik and to relay her message to Romine. According to Babnik, Moritz told her to "stop calling and asking for light duty; there is no light duty available for you." Plf.'s LR 56.1 Statement ¶ 90, ECF No. 84. Because Moritz's instruction came from a supervisor upstream in the chain of command, Babnik understood it as a direct order.

The next month, in September 2016, Moritz and Scott Babnik encountered each other in the parking lot of the Police Department. Scott spoke to Moritz about his wife's injuries and the Village's denial of her light-duty request. Moritz memorialized that conversation in a memorandum, which he showed to and discussed with Huffman. According to the memorandum, Scott told Moritz that Babnik wanted to come back to work but that her medical condition was deteriorating and that "everyone knows she is not coming back." Moritz Memorandum re Scott Babnik, ECF No. 85-21. As an example, Scott told Moritz that Babnik was "having difficulty walking up the stairs with the baby in her arms." *Id.* Per the memorandum, Moritz further told Scott that the Department was awaiting more detail about Babnik's restrictions before it would grant her light duty. Scott averred, however, that the memorandum described conversation that did not occur and mischaracterized portions that did. Scott claims instead that he expressed disbelief

to Moritz at the Department's denial of light duty. He also declares that he did not state that his wife's inability to work was common knowledge and that Moritz never told him that the Department needed more information from Babnik about her light-duty request.

Babnik stopped asking for light duty and returned the FMLA paperwork pursuant to Keim and Romine's instructions. One of Babnik's physicians, Dr. Elizabeth Soifer, completed that documentation. In a form dated September 9, 2016, Soifer described Babnik's "chronic jaw pain," which caused her to have headaches, difficulties speaking, dizziness, and loss of peripheral vision. FMLA Documentation, ECF No. 68-23. Dr. Soifer affirmed that Babnik was "no longer able to perform her duties due to her medical condition" and that her condition was "chronic," and "lifetime." *Id.* Supplementing the FMLA form, Soifer also signed a form certifying Babnik "as permanently disabled from police service." 9/6/2016 Disability Certification, ECF No. 68-26.

Soifer later testified that, at the time she examined Babnik, she was relying on Babnik to provide her information about what she could or could not do. When Soifer examined Babnik, Babnik did not ask Soifer whether she could work in a modified duty position; she only told Soifer that she worked as a police officer. Soifer also testified, however, that nothing in her medical records confirmed that Babnik was unable to work in any capacity. Ultimately, Soifer testified that Babnik could have worked a position that accommodated her difficulty with speaking and seeing clearly, such as one that involved typing. She provided her opinion to a degree of reasonable medical certainty and based on her examination of Babnik.

On September 20, 2016, Keim sent Babnik a letter approving her FMLA leave. When that leave expired on October 6, 2016, Babnik submitted a request for a continuation of personal leave that the Village provided pursuant to internal policy. Babnik wrote "N/A" next to "Anticipated Return to Work Date" on the personal leave request form. Personal Leave Request Form, ECF No.

68-29. In November 2016, Keim followed up with Babnik, informing her that her leave was ending in December and inquiring whether she "plan[ned] on returning to work." Plf.'s Resp. to Def.'s LR 56.1 Statement ¶ 35, ECF No. 77. Babnik did not respond. She interpreted the Village's inquiry to concern when she could return to work in a full-duty capacity.

The Village then sent Babnik a letter dated December 13, 2016, informing her of her termination effective December 8, 2016 due to her failure to indicate a date when she would be able to return to her duties. Almost a year later, in October 2017, the Board of Trustees of the Antioch Police Pension Fund awarded Babnik a line of duty disability pension retroactive to August 21, 2016—the last day Babnik received full pay.

In June 2018, Babnik brought this lawsuit against the Village after exhausting her administrative remedies. She claims that the Village discriminated against her based on her sex by denying her light duty and terminating her. She also maintains that Antioch violated the Americans with Disabilities Act ("ADA") by failing to accommodate her disability and terminating her. Babnik claims as well that the Village terminated her in retaliation for her requests for accommodation. The Village has moved for summary judgment, and the Court considers each of Babnik's theories of relief in turn.

## II.     Discussion

Although Babnik's complaint includes four counts, her claims are based on two adverse employment actions: denial of her light duty requests and termination. This opinion considers whether she has adduced evidence sufficient to support a jury's verdict that the adverse employment actions taken by the Village were the product of sex- or disability-based discrimination and/or retaliation for seeking light duty.

A.    **Denial of Light Duty Requests**

Babnik contends that she was denied light duty in 2016 both because she is a woman and due to her disability. Both theories warrant consideration by a jury.

1.    **Sex-Discrimination Based on Denial of Light Duty**

Babnik claims that the Village discriminated against her on the basis of sex in violation of Title VII of the Civil Rights Act of 1964 when it denied her light duty. To overcome summary judgment, Babnik must show that the evidence as a whole would permit a reasonable factfinder to conclude that her sex caused the denial of light duty. *Ortiz v. Werner Enterprises*, *Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). On Babnik's account, the Village's failure to accommodate her was a symptom of rampant sex discrimination within the Police Department. Some of her arguments on this front are more persuasive than others. Ultimately, Babnik's evidence of differently treated male officers precludes summary judgment on her sex-discrimination claim.

To briefly address her weaker points, much of Babnik's so-called circumstantial evidence of discrimination lacks the requisite connection to her sex. Beyond general animosity, Babnik must show that discriminatory bias based on her sex motivated the Village's decisions. *See Todd v. JB for Governor*, No. 19 C 00392, 2021 WL 3633931, at *4 (N.D. Ill. Aug. 17, 2021). In this respect, Babnik falls short. She emphasizes that Moritz allegedly told her that "there is no light duty available for you," Plf.'s LR 56.1 Statement ¶ 90, ECF No. 84, surmising that the addition of "for you" could only mean that light duty was not available to women. That interpretation is mere speculation; myriad justifications apart from Babnik's sex can explain why light duty was not available to Babnik. Nor does Moritz's memorandum describing Babnik's alleged difficulty walking up stairs while carrying her baby exhibit, as Babnik argues, "sex stereotypes." Resp. Br. at 8-9, ECF No. 81. Persons of any gender carry babies; a passing reference to a child does not in any way reflect discriminatory bias. In the same way, Babnik's expert testimony that the Village's

8

leave policy was unreasonable has no bearing on her sex-discrimination claim. The Village's deviation from general professional standards in handling accommodations—as opposed to, for example, internal deviation from its own professional standards when assessing the accommodation of women with disabilities, *compare Joll v. Valparaiso Cmty. Sch.,* 953 F.3d 923, 931 (7th Cir. 2020)—has nothing to do with her sex.[1]

Babnik further argues that the Village's shifting justifications for its denial of light duty raise an inference that its proffered reason for denying light duty was pretextual. *See, e.g.*, *Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003). She cites her own account of Moritz's justification—that there was no light duty available for her—and compares it to the Village's position—that Babnik did not provide enough information to support her request. But Moritz's and the Village's positions in this litigation have always aligned. Moritz claims that there was no light duty available to Babnik precisely because she could not show that she was qualified. Babnik may dispute that characterization, but that does not mean that the Village shifted justifications for its actions during this litigation.

Evidence of other sexist behavior within the police department does not help Babnik either. Babnik cites the actions of Department employees who were either not involved in the decision to

---

[1] For the same reason, the Village argues that the expert's testimony should be disregarded under Federal Rule of Evidence 702. The Court agrees. Mr. Goren's conclusion that a reasonably competent organization would have responded differently to Babnik's request has nothing to do with whether, in this instance, it responded differently because Babnik is a woman. It also cannot support Babnik's reasonable-accommodation claim. As described further below, "[w]hether a requested accommodation is reasonable or not is a highly fact-specific inquiry and requires balancing the needs of the parties." *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002). The expert's comparison to general professional standards in handling requests for accommodation—assuming such standards even exist—removes the fact-specific nature of the inquiry from the jury's province and into the hands of, well, another lawyer. Accordingly, the testimony cannot "help the trier of fact to understand the evidence or to determine a fact in issue" under Rule 702(a) and will be excluded.

deny her light duty or did not act in ways probative of discrimination. In another case, a jury found that the Village failed to promote another police officer due to her sex, but the relevant decision-makers in that case—the Village's Board of Police and Fire Commissioners—did not contribute to the decision to deny Babnik light duty. Absent any showing that the Board had any influence on the denial of light duty (and Babnik offers none) that judgment has no bearing on Babnik's case. *See Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 452 (7th Cir. 2009) (evidence of discriminatory conduct by non-decisionmaker employee irrelevant unless that employee influenced decisionmaker). Also without bearing are Sergeant Guttschow's admissions that he made discriminatory remarks about Babnik's sex and disability, however reprehensible those comments were. Babnik presents no evidence that Guttschow, as opposed to Moritz and Huffman, had anything to do with her light-duty request. As for Huffman, it is true that the Village terminated Huffman from the Chief of Police Position after learning of inappropriate behavior during an event he hosted in his home. That event, however, was an isolated incident that occurred in February 2020. It is hard to see how the denial of a light-duty request four years earlier could be related to that behavior.

What rescues Babnik's sex-discrimination claim from summary judgment is her evidence of comparable male employees who were treated more favorably. From evidence of differential treatment of similarly situated employees, a reasonable jury could find that discriminatory animus motivated the Village. In presenting such evidence, the plaintiff must identify a comparator who is "directly comparable to her in all material respects . . . to eliminate other possible explanatory variables." *Williams v. Off. of Chief Judge of Cook Cnty. Illinois*, 839 F.3d 617, 626 (7th Cir. 2016) (quoting *Perez v. Thorntons, Inc.*, 731 F.3d 699, 704 (7th Cir. 2013)). Once the plaintiff presents that evidence, determining whether a comparator is similarly situated is "usually a question for the

fact finder." *Coleman v. Donahoe*, 667 F.3d 835, 846-47 (7th Cir. 2012) (quoting *Srail v. Village of Lisle*, 588 F.3d 940, 945 (7th Cir. 2009)). Babnik offers three comparators, all male officers who were offered light duty around the same time Babnik was denied it.

It is undisputed that the Village assigned Alex Moreno, Jake Marsh, and Norm Johnson light duty while rejecting Babnik's request. Apart from Johnson, who is discussed below, those men were working the same job as Babnik and subject to the same chain of command. That's generally enough evidence from which a juror may conduct a "meaningful comparison." *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd*, 553 U.S. 442, 128 (2008). The Village disagrees; it claims that Babnik must show that the men assigned light duty were aligned with her in work history, worker-compensation status and even symptoms of illness for her comparators to be relevant to a jury.

In so arguing, the Village grafts insurmountable requirements onto the comparator inquiry. That Babnik's comparators differed in work history or were obtaining worker's compensation at the time they were assigned light duty are hardly distinctions that render the comparison "effectively useless." *Id.* at 405. Whether or not Babnik's comparators suffered from injuries that were more amenable to light duty is a more relevant distinction. But considering that (as detailed more extensively below) questions of fact regarding Babnik's ability to work light duty remain, comparing her injuries to that of the comparators would "devolve into a mechanical, 'one-to-one mapping between employees.'" *Coleman*, 667 F.3d at 847 (quoting *Humphries*, 474 F.3d at 405). That reading of the law would eviscerate the Seventh's Circuit's repeated emphasis that the similarly situated inquiry is "flexible, common-sense, and factual." *Id.* at 840, 846-47.

Indeed, most of the Village's differences between the comparators are immaterial. For instance, the Village points out that Babnik's comparators submitted doctor's notes to support their

light-duty requests without being asked to do so. That difference only matters if there were a formal policy that officers were required to follow to obtain light duty, and the Village admits that there was no such policy. Babnik also offers evidence that Moreno was cleared for light duty before anyone at the department received a physician's note and that he was allowed to verbally relay information he received from his doctor in order to receive light duty. She also disputes that Marsh provided a doctor's note before the Village assigned him light duty. Given the conflicting evidence, it would be equally reasonable for a juror to ascribe the differential treatment to sex discrimination as it would be to a failure to follow the unwritten rules.

The Village does, however, point out a material difference in one of Babnik's comparators: Sergeant Johnson. Although Johnson worked a light duty assignment starting in October 2016, he was a Sergeant, and Babnik was a Patrol Officer. Whether a more highly ranked employee is an apt comparator commonly depends on the type of discrimination an employee is alleging. *See Rodgers v. White*, 657 F.3d 511, 517-18 (7th Cir. 2011). When a plaintiff alleges that an employer denied her a job position to which she was entitled, the probative value of the comparative evidence plummets when the comparator has different job duties and responsibilities. *See id.* Here, the Village was well within its rights to treat Sergeant Johnson differently from Officer Babnik because it did not need as many sergeants on patrol or because a sergeant can more effectively perform a supervisory role on light duty. The difference in rank here between Sergeant and Patrol officer renders the isolation of sex discrimination—rather than an operational decision—as an explanatory variable impossible.

Still, even one relevant comparator can provide sufficient evidence from which a juror could infer discrimination, *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 657 (7th Cir. 2021), and Babnik offers two apart from Johnson. Babnik's other evidence, such as Moritz's

remarks and other Department officers' behavior, does not help her sex discrimination claim. Even so, a reasonable jury could infer that the Village discriminated against Babnik because it treated her differently from her male colleagues. Whether the Village's proffered explanation for the disparity in treatment is credible is ultimately a question for the jury to decide.

### 2. Denial of Light Duty as an ADA Violation

The ADA requires employers to reasonably accommodate qualified individuals with disabilities. *McAllister v. Innovation Ventures, LLC*, 983 F.3d 963, 967 (7th Cir. 2020). To prevail on summary judgment for the Village's failure to accommodate her disability, Babnik bears the burden of demonstrating that she is such a "qualified" individual, or a person who "can perform the essential functions" of employment "with or without reasonable accommodation." *Id.*; *see also* 42 U.S.C. § 12111(8). If Babnik establishes that she requires an accommodation to perform those essential functions, she must also show that her requested accommodation is reasonable. The reasonable accommodation inquiry is "highly fact-specific" and "requires balancing the needs of the parties." *McAllister*, 983 F.3d at 967-68 (quoting *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002)). As ever, summary judgment is warranted on these claims if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Village argues that Babnik was not qualified to perform any of the essential functions of a patrol officer, reasonable accommodation or not. It further argues that in any case, Babnik's requested accommodation—what it characterizes as a permanent request for light duty—was unreasonable as a matter of law. To determine whether Babnik could work with the

13

accommodation she requested, it is essential to understand the nature and scope of her request. The Court therefore addresses the reasonableness of Babnik's requested accommodation before turning to her qualifications.

*a)*      ***Reasonable Accommodation and Interactive Process***

To the extent that Babnik was requesting permanent light duty, the Village rightly characterizes Babnik's request as unreasonable. The ADA may compel an employer to offer a disabled employee a permanent-light duty position if such a vacant position is available and does not present an undue hardship. *See E.E.O.C. v. United Airlines, Inc.*, 693 F.3d 760, 761 (7th Cir. 2012). But it does not compel the creation of permanent light-duty positions where none exist. *Watson v. Lithonia Lighting*, 304 F.3d 749, 752 (7th Cir. 2002); *Gratzl v. Office of the Chief Judges*, 601 F.3d 674, 680 (7th Cir. 2010). Babnik does not dispute that the Village did not have permanent light-duty positions available. In September 2016, Babnik indicated that she was permanently disabled from the police force on her FMLA documentation and could no longer perform her duties. At that point, Babnik's requested accommodation was unreasonable, and the Village could lawfully refuse her request.

The September 2016 FMLA request was not, however, Babnik's first request for light duty. Babnik first requested an accommodation almost three months earlier, when she contacted Moritz at the beginning of July. At that point, nothing in the record reflects that her request was for a permanent accommodation, and there is no dispute that temporary light-duty positions were available. In fact, other officers were assigned light-duty positions around the time of Babnik's first request. If an employer offers temporary light-duty positions to employees recovering from injuries, an employer must afford disabled employees the same treatment absent a showing of

undue hardship. *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 482 (7th Cir. 2017). That the Village did not do.

The Village protests that Babnik's first note from her treating physician, Dr. Jacob, established that she could never come back to work in any capacity, comparing her case to *McAllister v. Innovation Ventures, LLC*. 983 F.3d at 970. In that case, an employee's doctor informed her employer that the plaintiff could not perform "any [and] all functions" of her job. *Id.* at 966. The Seventh Circuit relied on the doctor's view that the employee could never return to work in granting the employer summary judgment. *Id.* at 968-69.

Unlike in *McAllister*, nothing in Dr. Jacob's Medical Permission Excuse note suggested that Babnik was totally precluded from any type of work or that her condition was permanent. In fact, the note suggested the opposite: that Babnik's regular duties "could be impaired" "***until***" she completed an MRI and neurology assessment. Medical Permission Excuse, ECF No. 68-7 (emphasis added). Jacob also requested that the Village "consider excusing Christine from routine work ***until*** further notice." *Id.* (emphasis added). That is, the note contemplated a possible return to full capacity pending further examination. At the time Babnik requested light duty, the Village "had no way of knowing whether [her] injury was temporary," *Gatlin v. Vill. of Summit*, 150 F. Supp. 3d 984, 993-94 (N.D. Ill. 2015), and had reason to believe that it was. To be sure, Babnik ultimately requested a permanent accommodation. But in July 2016, there was no reason for the Village to deny Babnik a temporary light-duty position pending further medical assessments. *See Gibson v. Milwaukee County*, 95 F. Supp. 3d 1061, 1073 (E.D. Wis. 2015) (finding employer's removal of employee from vacant temporary-light duty position a failure to accommodate, even when the employee's disability later proved to be permanent). The benefit of the Village's later knowledge does not excuse the Village from ignoring Babnik's request.

The Village did, of course, offer Babnik FMLA leave, but that was not a suitable alternative to light duty. The ADA does not mandate an ideal or preferred accommodation, only a reasonable one. *See Gratzl*, 601 F.3d at 682. That said, reasonable does not mean subpar. *See Lawler v. Peoria Sch. Dist. No. 150*, 837 F.3d 779, 787 (7th Cir. 2016). Compelling Babnik to exhaust her FMLA leave when she was willing and able to work cannot fairly be considered a reasonable accommodation. Babnik could have used that FMLA leave—which is generally unpaid—for childcare, elder and family care, or extended illness. *See Gibson*, 95 F. Supp. 3d at 1073 (requiring employee to take FMLA leave was unreasonable considering availability of temporary light duty). The Village cannot hide behind its offer of FMLA leave after ignoring the existence of a more reasonable alternative. *See also Smith v. Concentra, Inc.*, 240 F. Supp. 3d 778, 787 n.2 (N.D. Ill. 2017) (remarking upon lack of authority establishing long-term FMLA leave as a reasonable accommodation).

In any case—no matter the reasonableness of Babnik's request or the reasonableness of its own response—the Village blames Babnik for all that went wrong. According to the Village, it was incumbent upon Babnik to clarify the precise scope and duration of her injury, and Babnik's less-than-perfect doctor's note absolves it of any fault. Once Babnik notified the Village of her disability, however, responsibility to determine the existence of a reasonable accommodation lay with the Village. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1062 (7th Cir. 2014). As the Village points out, failure to engage in the interactive process does not, on its own, subject it to liability. *McAllister*, 983 F.3d at 972. Be that as it may, if the Village's refusal to engage in the interactive process prevented it from offering a reasonable accommodation, the Village is on the hook. *Spurling*, 739 F.3d at 1062. And as discussed, the Village knew that a reasonable accommodation in the form of temporary light-duty work was available yet denied it to Babnik.

If the Village or the Department needed more information from Babnik, they should have asked for it. *See Lawler*, 837 F.3d at 787-88. The Village responds that the Department did request more information about the types of work Babnik could do given its concerns with her balance and vision issues. Babnik, for her part, denies that anyone at the Village or the Department asked her to supplement her light-duty request. She says that she reasonably relied on previous experience and her understanding of the chain of command when asking for light duty. According to Babnik, the Department granted her light-duty request during her 2015 pregnancy without asking for any supporting documentation, further bolstering her understanding that her submission was sufficient. Further, Scott Babnik's declaration and Moritz's memorandum recounting their September 2016 meeting in the parking lot describe differing accounts of the Village's position about Babnik's light-duty request. The Court cannot resolve these conflicting accounts regarding the breakdown in the interactive process; that is left to the jury. *See Lawler*, 837 F.3d at 787.

According to Babnik's account—which this Court must accept as true at this stage, *see Tibbs v. Admin. Off. of the Illinois Cts.*, 860 F.3d 502, 503 (7th Cir. 2017)—Babnik asked Moritz for light duty, and he denied it outright despite knowing light-duty positions were available. *See id.* at 786 (finding summary refusal of employee's request indicative of failure to engage in interactive process). Not only that, but Moritz also told Babnik to stop asking for light duty in the future. A supervisor's direct order to stop asking about accommodations is anathema to the interactive process the ADA champions. Taking Babnik's facts as true, the Village abdicated its responsibility to accommodate and instead shut off all avenues of dialogue.

The Village declares Moritz's interaction with Babnik immaterial because he lacked authority to grant or deny her light duty. This contention is puzzling given the Village's admission that it delegated any light-duty decisions to the Police Department, specifically Chief of Police

Huffman. And Moritz admits that he discussed Babnik's light-duty request with Huffman immediately after Babnik gave him the Medical Permission Excuse Note. He also testified that he showed Huffman Babnik's August 8 text message, and that Huffman asked him to contact Lori Romine rather than grant the request. A jury could reasonably infer from those facts that Moritz was acting pursuant to Huffman's ultimate authority to grant or deny light duty. A reasonable jury could find, therefore, that the Village, acting by delegation through the Department's chain of command, shut down the interactive process.

By summarily denying Babnik light duty, the Village failed to identify a reasonable accommodation that was available to her at the time. Doubtless, the Village's failure was of a limited duration; Babnik's July 2016 request was only reasonable until she indicated her disability was permanent in her September 2016 FMLA request. Nonetheless, even that two-month span can subject the Village to liability if Babnik was qualified to work at the time. *See Gibson*, 95 F. Supp. 3d at 1073. The Court therefore turns to the question of qualifications.

### b)      *Qualified Individual*

Babnik cannot base her failure-to-accommodate claim solely on the existence and denial of a reasonable accommodation. She must also show that she was able to perform the essential functions of the job, with or without accommodation, to prevail. *McAllister*, 983 F.3d at 967. When evaluating whether Babnik was qualified, the Court looks to Babnik's abilities at the time that the Village denied her light duty in July 2016. *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 818 (7th Cir. 2004).

Babnik first argues that she could perform the essential functions of a patrol officer even without an accommodation. Following Babnik's logic, light duty was not an accommodation at all. But in that case, a police officer would never have to patrol; the ability to perform

administrative work at a desk would suffice to be an officer. That cannot be the case. As a matter of common sense, police officers must be able to patrol outside the office. And in Babnik's case, she would not have had to request light duty if she could perform all of a police officer's essential job functions. She admits, however, that she could only work light duty. Indeed, the very term light duty implies the existence of positions that require the performance of additional duties—full capacity work. Babnik's admission that light-duty was a position available for a patrol officer only in certain circumstances, such as when an officer was injured on the job, reaffirms that reality. Light duty could not be anything other than an accommodation.

Whether Babnik was qualified to work with that reasonable accommodation at the time that the Village denied her request is the more salient question. By that measure, Babnik has presented sufficient evidence to overcome summary judgment. Babnik's own assessment that she could perform light duty may not on its own establish that she was qualified to work, *see Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 419 (7th Cir. 2016), but she relies on more than that. Babnik testified that Dr. Jacob told her that she was able to work light duty at the time he wrote her the medical permission excuse note. In characterizing this testimony as inadmissible hearsay, the Village overlooks the exception excluding statements reasonably pertinent to medical diagnosis or treatment. Fed. R. Evid. 803(4)(A). Babnik's capacity to work is not only pertinent to but directly related to her medical treatment, so it falls squarely within that hearsay exception. Babnik also points to Dr. Jacob's opinion, to a reasonable degree of medical certainty, that Babnik could have worked at a desk at the time he assessed her. In addition, Babnik's primary-care physician, Dr. Soifer, testified similarly, opining that Babnik could type and speak normally. Both Jacob and Soifer testified that they knew that Babnik was a police officer and that her medical records did not establish that Babnik could not work in any capacity.

The Village casts aspersions on the doctors' testimony, but its protests go to the testimony's weight, rather than its admissibility. Arguing that the doctors' testimony lacks foundation, the Village points out that Jacob and Soifer both testified that they did not review any job description defining light-duty tasks before examining Babnik and that they issued their assessments based only on the information that Babnik provided them. The Village agrees, however, that light duty involves administrative and clerical tasks such as filing paperwork or speaking on the phone. Whether Babnik could see, speak, and type would be readily apparent to the doctors when interacting with her. From their observations of Babnik, Jacob and Soifer could later opine on whether she was wholly incapacitated or whether she could perform basic tasks amenable to light-duty work. The Village is free to raise its concerns on cross-examination, but the doctors' testimony is not so lacking in foundation as to be thrown out altogether. *See Ferguson v. City of Chicago*, No. 13 C 4084, 2015 WL 5996332, at *8 (N.D. Ill. Oct. 13, 2015) (denying summary judgment in light of testimony of rehabilitation counselor—who relied on interview with plaintiff and plaintiff's medical history—that plaintiff could perform essential functions of the job).

The Village also argues that the doctor's opinions expressed a mere possibility or good chance that Babnik could work light duty, which cannot establish that Babnik was qualified. *See, e.g.*, *Weigel v. Target Stores*, 122 F.3d 461, 463 (7th Cir. 1997). But the doctors' ultimate conclusions were not as equivocal as the Village suggests. During Babnik's visit with him, Jacob expressed "hope[]" that there would be a position available for her—but that was before he later learned that such a position, light duty, did exist. Jacob Dep. at 29, ECF No. 68-8. Soifer remarked that she was unable to speculate about Babnik's capacity at the time she examined her, but she too was unaware of the possibility of light duty at the time. When asked to provide as specific opinion about Babnik's work capacity in hindsight, Jacob and Soifer stated, to a reasonable degree of

professional certainty, that Babnik could have worked at a desk. Reasonable certainty that Babnik could have worked light duty is more than mere hope or possibility that a proposed treatment would have adequately addressed her needs. *Cf. Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 289 (7th Cir. 2015). And it is enough to preclude summary judgment in this case.

Next, the Village protests that Babnik's disability pension application and her testimony before the Pension Board establish that she could not have worked light duty. The Village exaggerates Babnik's description of her own symptoms. In her Pension-Board submissions, Babnik described an injury to her jaw, which sporadically rendered it difficult to speak clearly. Swelling to the jaw also caused "muffled hearing." Disability Pension App, ECF No. 68-5. On good days, Babnik suffered from jaw pain and headaches but still would be able to move around. Bad days found her "curled up in bed." Pension Bd. Testimony Tr. at 109, ECF No. 68-3. That smattering of symptoms illustrates the daily toils of a person living with a disability. It does not establish, however, that Babnik was bed-ridden, that she could not manage her symptoms in a desk job managing cold-case files, or as the Village claims, that she possessed an "inability to see, speak, hear, and report to or remain at work." Def.'s Reply at 5, ECF No. 89. In fact, Babnik testified to experiencing similar symptoms since 2010, including when she was pregnant and working light duty for seven months in 2015. In that role, Babnik's supervisors praised her for her unparalleled productivity and phenomenal work. Babnik's prior success in her light-duty role—her symptoms notwithstanding—supports an inference that she could do the same a year later. *See Jankowski v. Dean Foods Co.*, 378 F. Supp. 3d 697, 708 (N.D. Ill. 2019). Nevertheless, the Village paints Babnik's symptoms as rendering her completely incapacitated. The record does not reflect that assessment.

The Village cannot rely on hyperbole to obtain summary judgment. Babnik's doctors testified that Babnik was able to perform light duty, and her description of her symptoms is consistent with that testimony. When Babnik asked for a light-duty position in June 2016, the Village could have allotted her a temporary spot. Only when it became apparent that Babnik's condition was permanent was the Village—which had no permanent light-duty positions—relieved of its obligation to accommodate Babnik's disability. Accordingly, the Village's motion for summary judgment on Babnik's failure-to-accommodate claim is denied.[2]

### B. Sex- and Disability-Discrimination and Retaliation Based on Termination

Although there are disputed fact issues that preclude summary judgment for the Village with respect to its denials of Babnik's light duty requests, there is no evidence to support her claims that the Village terminated her based on her sex or disability. Nor is there any basis to conclude that her termination was in retaliation for her light duty requests.

To begin, Babnik cites no evidence that sex-based animus played any role in her termination. *See Todd*, 2021 WL 3633931, at *4. Instead, she relies entirely on the evidence, discussed above, on which her light-duty claim is based. That claim survives summary judgment only because there is some comparator evidence that permits an inference of differential treatment

---

[2] The Court notes, however, that the question of damages may pose a problem for Babnik at trial. In her complaint, Babnik sought appropriate "back pay, front pay, and any other actual and compensatory damages" based on "injury to her career and other injuries," as relief for the Village's alleged violations. Compl. ¶¶ 46, 55, ECF No. 1. But as determined below, Babnik's termination-based claims do not survive summary judgment, and the Village continued to pay Babnik at least until she went on FMLA leave. She is therefore not entitled to any back or front pay, especially given that the Village granted her a disability pension. As for actual or compensatory damages based on the denial of Babnik's light duty request, it is unclear what kinds of damages Babnik will be able to recover. Only two months passed between Babnik's first light-duty request to the time she admitted her injury was permanent, so any damages stemming from working in full-duty status for two months may be minimal.

based on the sex of officers requesting light duty. But there is no similar evidence that female officers were terminated for requesting light duty when male officers were not.

For instance, Babnik's assertion that Moreno was allowed to retire while she was terminated is a distinction without a difference given that she too, was afforded a disability pension retroactive to the date her employment with the Antioch police department ended. Nothing in the record suggests that the purported distinction between termination and allowed retirement affected the amount of Babnik's pension or in any other way disadvantaged her. In any event, Babnik offers nothing to show that any distinction between termination and retirement bears any relation to her request for light duty or to her sex. All the other evidence in the record supports only one reasonable inference: that the Village terminated Babnik based on her own acknowledgment that she was not going to be able to return to regular patrol duties.

Babnik's ADA and retaliation theories regarding her termination fail for the same reason. To prevail on either type of claim, Babnik must show that discrimination or retaliation was the but-for cause of the adverse-employment action. *Monroe v. Indiana Dep't of Transportation*, 871 F.3d 495, 504 (7th Cir. 2017); *Kotaska v. Fed. Express Corp.*, 966 F.3d 624, 632 (7th Cir. 2020). As discussed, it is undisputed that Babnik was determined to be "permanently disabled" at the time the Village terminated her. 6/2016 Disability Certification, ECF No. 68-26. Babnik therefore could not have ever returned to a full-time position as a Patrol Officer. It is further undisputed that the Village had no permanent-light duty positions available. Again, the ADA does not compel the Village to create a permanent light-duty position for Babnik where none exists. *Watson*, 304 F.3d at 752.

The only reasonable conclusion supported by the evidence is that the Village terminated Babnik because it did not have an open position in which she could work. Rather than sex- or

disability-discrimination or retaliation, it is clear that reasonable staffing considerations motivated the Village to terminate Babnik. Summary judgment is therefore granted to the Village on Babnik's claims that the Village terminated her in violation of the ADA or Title VII of the Civil Rights Act of 1964.

*        *        *

For the reasons set forth above, the Village's motion for summary judgment is granted in part and denied in part. Babnik has presented enough evidence from which a reasonable jury could find that the Village failed to reasonably accommodate her between July and September of 2016. She has also presented enough evidence from which a reasonable jury could find that the Village denied her light duty due to her sex. She has failed, however, to meet her burden of showing that the Village failed to accommodate her by denying her a permanent light duty position. And she has also failed to show that the Village terminated her because of her sex, her disability, or in retaliation for any protected conduct.

Dated: July 27, 2023

John J. Tharp, Jr.
United States District Judge